IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| BEVERLY HICKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:09-CV-161 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of
defendant Commissioner's final decision denying plaintiff's claim for Supplemental Security
Income ("SSI") benefits under Title XVI of the Social Security Act. For the reasons set forth
herein, defendant's motion for summary judgment [doc. 12] will be granted, and plaintiff's
motion for summary judgment [doc. 8] will be denied. The final decision of the
Commissioner will be affirmed.

I.

*Procedural History*

After at least three unsuccessful prior applications, plaintiff filed the present
request for benefits in May 2007, claiming to be disabled as of May 1, 2005, by lupus, neck
pain, migraines, bipolar disorder, depression, and a "tailbone out of place which can't be
fixed." [Tr. 20, 98, 105]. The claim was denied initially and on reconsideration. Plaintiff

then requested a hearing, which took place before an Administrative Law Judge ("ALJ") in September 2008.

On December 12, 2008, the ALJ issued a decision denying benefits. He concluded that plaintiff suffers from lupus, depression, and a personality disorder, which are "severe" impairments but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 10].[1] The ALJ found plaintiff to have a limited residual functional capacity ("RFC") at the light level of exertion further restricted to simple, unskilled work. [Tr. 11]. Relying on vocational expert testimony, the ALJ determined that plaintiff remains able to perform a significant number of jobs existing in the national economy. [Tr. 15-16]. Plaintiff was therefore found ineligible for SSI benefits.

Plaintiff then sought review from the Commissioner's Appeals Council. On June 8, 2009, review was denied, notwithstanding plaintiff's submission of more than twenty pages of additional medical records. [Tr. 1, 4, 567-90].[2] The ALJ's ruling then became the

---

[1] Plaintiff self-reports a 1987 lupus diagnosis. [Tr. 311]. The files of her medical providers repeat that self-report, but the record does not appear to contain an actual, formal *diagnosis* of the disease. Nonetheless, the Commissioner does not dispute that plaintiff suffers from lupus.

[2] "[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted). This court can, however, remand a case for further proceedings, but only if the claimant shows that her evidence meets each prong of the "new, material, and good cause" standard of sentence six, 42 U.S.C. § 405(g). *Id.* Plaintiff's briefing to this court does not refer to her Appeals Council evidence or to sentence six. The issue is thus waived, and plaintiff's additional medical evidence [Tr. 567-90] has *not* been considered by this court. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006).

2

Commissioner's final decision. Through her timely complaint, plaintiff has properly brought her case before this court for review. *See* 42 U.S.C. § 405(g).

*Background and Testimony*

Plaintiff was born in 1969 and has a GED. [Tr. 21]. She reports minimal prior employment. [Tr. 103]. In 2004, she worked for approximately three weeks in a grocery store delicatessen. [Tr. 23, 129, 134]. Plaintiff claims that she was fired from that job because the employer erroneously accused her of not disclosing her prior theft conviction. [Tr. 306]. In 2007, plaintiff worked for one or two days as a cashier in a shopping mall. [Tr. 22-23]. Plaintiff claims she was fired from that job because "the lady at child support kept calling my job. They fired me because of the child support issue." [Tr. 23, 391].[3] In 2006, plaintiff completed mail-order veterinary assistant classes but was unable to find employment in that field. [Tr. 21-22, 306].

Plaintiff testified that she is primarily unable to work due to "the anger issues, and the bipolar, and the pain from the Lupus." [Tr. 25]. She claims that her lupus causes severe, "impossible" pain that "never stops." [Tr. 26, 64, 117]. However, plaintiff has elsewhere described her pain as episodic with as much as five months passing between attacks. [Tr. 27, 311]. She claims that during her lupus flare-ups, "There's nothing I can do, except just lay around, I'm just . . . too weak to move, more or less." [Tr. 27]. Plaintiff

---

[3] Plaintiff claims that "child support court" both "forced" her to get the job and then got her fired two days later by "calling and calling" and "hounding" the employer. [Tr. 416].

testified that she cannot afford rheumatological care for this condition. [Tr. 27].

Plaintiff further purports to have suffered daily "bad migraine headaches" since age 16 lasting from less than an hour up to "all day long." [Tr. 40-41, 153]. She also claims "very painful, shooting" neck pain. [Tr. 42].

Plaintiff reports psychic visions occurring in her dreams. [Tr. 307]. She claims, "I don't have hallucinations but I see visions. I see what's gonna happen in the future and 95% of the time I'm right. Dr. Yong [psychiatrist] said it was because I had 85% Cherokee in me." [Tr. 393].

Plaintiff can drive, although she has advised the Commissioner that she possesses neither a car nor a drivers license. [Tr. 124, 148]. In September 2006, plaintiff stated that "child support" will not allow her to have a drivers license [Tr. 304], but in February 2008 she was driving. [Tr. 465]. As of the 2009 filing date of this appeal, plaintiff owned a car and reported a monthly gasoline expense. [Doc. 1, p. 5, 7]. She also owned a car as of April 2003. [Tr. 196].

The administrative record shows that plaintiff has been a "no-show" for several medical appointments, which she has blamed at least in part on a lack of transportation. [Tr. 186, 191, 193, 195].[4] In September 2003, plaintiff phoned her nurse practitioner's office requesting a medication refill. She was advised that her file showed "0 refills" for the medication, apparently in part due to three recent "no shows." [Tr. 193]. Plaintiff responded,

---

[4] When the option of public transportation is raised, plaintiff responds, "No way. I'm not gonna ride with someone I don't know." [Tr. 394].

4

"F___ you" and hung up the phone. [Tr. 193]. On a February 2004 phone call to the same office, plaintiff was noted to be "cussing [and] calling names"[Tr. 187], resulting in a file notation that "if [plaintiff] continues to be rude [and] abusive to nursing staff [she] may benefit from finding another provider's office." [Tr. 186]. Plaintiff has advised the Commissioner, "I don't get along with most [of my family because they don't understand I am very sick they think I'm pretending or something because I am so irritable." [Tr. 126].

III.

*Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g)*; Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

5

An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. *See* 42 U.S.C. § 1382(a). "Disability" is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.

> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof at the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *Id.*

IV.

*Analysis*

The medical opinion evidence of record in this case consists of: four short statements by an attending nurse practitioner; three consultative examination reports; and four RFC assessment forms completed by nonexamining sources. In his decision, the ALJ summarized the three consulting examiner reports. [Tr. 12-14]. Regarding the four RFC forms, he stated in full, "As for the opinion evidence, the State agency medical opinions are given great weight because they are consistent with other medical opinions and the record as a whole." [Tr. 14]. Without further express insight into his reasoning process, the ALJ concluded that plaintiff remains able to perform simple, unskilled work at the light level of exertion. [Tr. 11, 14-15].

On the surface, the written ruling below provides little explanation as to how the various medical opinions were weighed, and plaintiff now levels a multitude of criticisms toward that decision. The court will address those issues in turn. All other matters not expressly raised by plaintiff are deemed waived. *See Hollon v. Comm'r of Soc. Sec.*, 447

7

F.3d 477, 491 (6th Cir. 2006).

### A. Social Security Ruling 96-8p

Social Security Ruling 96-8p, 1996 WL 374184, emphasizes that the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." Plaintiff argues that the ALJ violated SSR 96-8p by not individually discussing her abilities to "lift twenty pounds occasionally or ten pounds frequently, to do a good deal of walking or standing, or to sit while pushing or pulling arm or leg controls . . . ." [Doc. 9, p.12].

However, plaintiff does not take her SSR 96-8p argumentation any further. No opinion evidence is cited and no theories are advanced to support the argument that any of the above-cited abilities are any different than what was found by the ALJ. [Doc. 9, p.12]. The issue is accordingly waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted). SSR 96-8p does not require an ALJ to "decide or discuss uncontested issues." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 548 (6th Cir. 2002).

### B. Migraines and Cervical Spine Disease; Credibility

Next, plaintiff argues that the ALJ's decision was "unsupported due to his failure to properly consider Plaintiff's migraine headaches and cervical disc disease." The administrative record shows that plaintiff has at times sought medical care for complaints

8

relating to each of these conditions. In addition, x-rays of the cervical spine have shown "moderate" degenerative disc disease at C5-6 along with spurring, but no acute abnormality. [Tr. 226, 315, 489, 527].

As noted, plaintiff testified that she is primarily unable to work due to "the anger issues, and the bipolar, and the pain from the Lupus." [Tr. 25]. Consistent with that testimony, the ALJ imposed a physical restriction (no more than light exertion) "as a result of her lupus." [Tr. 11]. The ALJ cited a September 2006 consultative mental examination at which plaintiff "reported no major medical problems *other than lupus*." [Tr. 13, 305] (emphasis added). The ALJ also cited a September 2006 consultative physical examination by Dr. Samuel Breeding. [Tr. 12]. Dr. Breeding opined that plaintiff could work in the range of light to medium exertion. [Tr. 314].

The court recognizes that plaintiff's headache and spinal complaints continued after Dr. Breeding's 2006 exam, but these issues were present prior to that date as well. [Tr. 98, 105]. Plaintiff brought both to Dr. Breeding's attention [Tr. 312] and he nonetheless concluded, as did the ALJ, that she remains able to meet the physical demands of light work.

Plaintiff's allegations regarding the effect of her alleged headaches and spinal pain are of course subjective. The ALJ deemed plaintiff's subjective reporting regarding "the intensity, persistence and limiting effects" of her conditions to be "not credible to the extent they are inconsistent with" the ability to perform simple, unskilled, light exertion. [Tr. 12]. In support of that conclusion, the ALJ again clearly relied on Dr. Breeding's findings and

plaintiff's September 2006 report of "no major medical problems other than lupus."

Consistent with the ALJ's conclusion, the administrative record suggests that plaintiff's subjective reporting is less than credible. The court notes the following inconsistencies or overstatements found in the record:

1. Plaintiff has stated that she "broke" [Tr. 37], "dislocated" [Tr. 156], or "fractured" [Tr. 312] her "tailbone" in a 2004 fall and is thus now unable to sit for more than thirty minutes at a time. [Tr. 38]. However, August 2004 imaging showed no fracture. [Tr. 253]. Although Dr. Breeding's examination showed "some tenderness" in that area [Tr. 313], the objective evidence is clear that plaintiff has not broken, dislocated, or fractured her "tailbone." [Tr. 253].

2. Plaintiff has claimed that her lupus causes severe, "impossible" pain that "never stops." [Tr. 26, 64, 117]. However, plaintiff has elsewhere described the condition as episodic with as much as five months passing between attacks. [Tr. 27, 311]. Plaintiff told psychiatrist Yong that her lupus was currently not symptomatic as of September 2007. [Tr. 468].

3. Plaintiff claims disabling bilateral carpal tunnel syndrome for which she sleeps in splints or braces. [Tr. 119-20]. She has alternatively claimed to have a cyst on the right wrist. [Tr. 155]. However, a November 2003 x-ray of the right wrist was normal [Tr. 229], as was February 2005 imaging of the left hand and forearm. [Tr. 247]. Dr. Breeding's consultative report does not suggest that plaintiff even raised these issues with him. Tinel's and Phalen's testing were not performed to verify the presence of carpal tunnel syndrome, and Dr. Breeding observed "normal range of motion of all major joints." [Tr. 313].

4. By telephone call on August 1, 2003, plaintiff sought additional pain medication from the office of nurse practitioner Catherine Raff due to having purportedly been bitten twice on her arm. [Tr. 193]. Even though she claims to have psychic powers, plaintiff told Ms. Raff's staff that she did not know whether she had been bitten by a rat, a bat, or a raccoon. [Tr. 193].[5] Ms. Raff's records indicate no concern over the possibility of an infection such as

_____

[5] In the court's view, these three creatures are easily discernible.

rabies, but a pain medication prescription was readily provided. [Tr. 193]. Plaintiff claimed to have obtained emergency room treatment for the alleged bites, but emergency room records on file do not support that claim. [Tr. 324-29, 332-35, 498-527].

5. As noted, plaintiff claims to have suffered daily "bad migraine headaches" since age 16 lasting from less than an hour up to "all day long." [Tr. 40, 153]. However, on April 29, 2003, plaintiff told nurse Raff that her headaches (noted to be exacerbated and of only one week's duration) did not feel like a migraine, and Ms. Raff opined that plaintiff was probably suffering tension headaches. [Tr. 194-95].

6. The February 28, 2008 record of Dr. Yong notes plaintiff's report that

> she had a "hickie" when she woke up in the a.m. and she states that someone broke into her apartment that night. The same thing happened last night and she drove to her mother's house because she was so scared. She was advised that she should contact the police immediately. She then states that her cousin told her that her apartment was haunted. <u>She decided</u> not to take Lorazepam.

[Tr. 465] (emphasis added). The following week, plaintiff reported this episode to nurse practitioner Ina Kay Bone but claimed that <u>Dr. Yong</u> "took her off" Lorazepam [Tr. 474], which is clearly not what is indicated in Dr. Yong's records.

7. Plaintiff has two children, and she claims to have voluntarily relinquished her parental rights early in their lives. Her explanations for so doing have been significantly inconsistent. At the administrative hearing, plaintiff testified, "Well . . . my mother had to pull me off of my daughter, and I didn't know I was trying to hurt my daughter. . . . So, when I had my son, I just went ahead and signed him over to my aunt to keep from hurting him." [Tr. 36]. To Ms. Jones, however, on two different occasions plaintiff claimed "I couldn't care for them with the lupus. I've never been kept away from my kids." [Tr. 306, 392].

11

8. At a September 2006 consultative examination, plaintiff acknowledged drinking alcohol as a teenager but denied any prior drug use. [Tr. 305]. At an August 2007 consultative examination, plaintiff "denied past or present use of alcohol and/or drugs." [Tr. 391]. However, in a brief 2000 psychiatric hospitalization, plaintiff was noted to have "experimented *on numerous occasions including up to the present time* with sedative hypnotics, opioid analgesics, marijuana, and alcohol." [Tr. 458].

9. In a June 13, 2007 filing with the Commissioner, plaintiff portrayed herself as virtually incapable of self-care and as unable to even safely go up and down the stairs in her home. [Tr. 121-26]. To nurse Bone in the following months, plaintiff complained of worsening migraines and dizziness. [Tr. 416-17]. These complaints arose at the same time that "child support court [was] want[ing] her to bring [a] list of places she's applied to [for employment]." [Tr. 417]. Plaintiff told Ms. Bone, "I've been weak and sick and I just can't do it." [Tr. 417].

10. By her own admission, most of plaintiff's family thinks she is malingering. [Tr. 126].

The court additionally notes plaintiff's statements and allegations regarding her minimal employment history. In 2006, plaintiff completed mail-order veterinary assistant classes, looked for a job, but was unable to find employment in that field. She alleges that she was performing her delicatessen and cashier jobs but was fired due to the purported mistakes or misdeeds of others - not because she could not do the work. Plaintiff claims to have performed volunteer or community service work approximately twenty hours per week from 2002 through 2004 [Tr. 129, 133], even though she has allegedly suffered from lupus and daily migraines since 1987 and 1985, respectively. Ms. Bone's appointment notes of March 6, 2007, record plaintiff's report: that she had "put in multiple applications [and] no one will hire her"; that she "has issues with riding public transportation"; and that she "can't

get to a job from where she lives." [Tr. 348].[6]  In January 2008, plaintiff was "taking care of an old lady."  [Tr. 466].  Collectively, these statements are inconsistent with a claimant "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ."  42 U.S.C. § 1382c(a)(3)(A).

At least as to plaintiff's complaints regarding her cervical spine, there exists some evidence of an underlying medical condition.  However, for the reasons cited above, substantial evidence supports the conclusion that plaintiff's subjective reporting in general -and thus her headache and spinal complaints in specific - are unreliable and overstated, and that the conditions are not "of a severity which can reasonably be expected to give rise to the alleged pain."  *See Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).  The court finds no reversible error.  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is a reason to believe that the remand might lead to a different result."  *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

---

[6]  "[I]ndividual considerations extrinsic to the disability itself cannot enter into a finding of disability."  *Harmon v. Apfel*, 168 F.3d 289, 293 (6th Cir. 1999).  "The travel factor that plaintiff contends is relevant to her disability determination is therefore an extrinsic factor . . . [and] *the law is clear* that we may not base our decision on plaintiff's argument."  *Id.* (emphasis added).  Further, the following issues are irrelevant to the disability determination: whether a particular job exists in the immediate area of plaintiff's residence; whether a specific vacancy exists; or whether plaintiff would be hired if she applied for a particular job.  42 U.S.C. § 1382c(a)(3)(B).

13

## C. FNP Bone's Statements

Between July 2005 and May 2006, nurse practitioner Bone wrote three brief "to whom it may concern" notes that plaintiff "should not be working [or is unable to work] at this time due to medical problems." [Tr. 302]. Ms. Bone has also opined to the State of Tennessee's Food Stamp Program that plaintiff should be exempt from their employment requirement due to "physical disability." [Tr. 289].

Plaintiff argues that the ALJ "did not properly consider" Ms. Bone's opinions. Plaintiff is incorrect. The ALJ addressed Ms. Bone's statements and adequately explained his rejection of them.

> The undersigned assigns no weight to her opinion because the opinion is not well supported by medical[ly] acceptable clinical findings and lab diagnostic techniques, is inconsistent with other substantial medical evidence of record[,] and the opinion is conclusory and inconsistent with treatment notes.

[Tr. 14]. There was no error. Mere statements that a claimant is "disabled" or "unable to work" are unavailing. The ultimate issue of disability is reserved to the Commissioner, not the medical provider. *See* 20 C.F.R. § 416.927(e)(1).

## D. Cervical Spine X-Rays

Plaintiff's next argument pertains to Dr. Breeding's report. Noting that plaintiff "may have had difficulty with sustained physical activity due to the lupus," Dr. Breeding opined that she would be limited to lifting "at least 25 pounds occasionally" and that she could sit and stand between four and six hours each per workday. [Tr. 314]. Dr. Breeding ordered x-rays of the cervical spine and he noted, "Radiology report will follow."

14

[Tr. 314].  The x-ray results, which are attached to Dr. Breeding's report, show "moderate" degenerative disc disease at C5-6.  [Tr. 315].

Plaintiff argues that "it does not appear he [Dr. Breeding] reviewed the x-rays in reaching his conclusions.  Had he actually seen the x-rays, he may well have noted additional limitations." [Doc. 9, p. 19].  The court rejects this argument as unduly speculative.  The x-ray record is attached to Dr. Breeding's file and there is no reason to think that he did not review it.  Further, even if Dr. Breeding had never seen the report, it was reviewed by nonexamining Dr. Michael Ryan who concluded that plaintiff could nonetheless perform medium work.  [Tr. 315, 317, 323].

### E. Response to Criticism

Senior Psychological Examiner Elizabeth Jones, M.A. performed two mental status examinations - in September 2006 and August 2007.  Plaintiff told Ms. Jones, "I have anger issues. . . .  I rant and rave.  I want to punch somebody's lights out.  I can control it but I do punch other things." [Tr. 390-91, 393].  Ms. Jones predicted no limitations [Tr. 308-09, 395] except that plaintiff "*may* have difficulty responding appropriately to criticism from supervisors *due to characterological issues*." [Tr. 395] (emphasis added).  Plaintiff now contends that the ALJ "failed to explain" why this limitation was not included in her RFC.

The ALJ did not err.  Ms. Jones found no psychomotor agitation or disordered thought process.  Similarly, the mental health providers have found "clear, organized, and coherent" thought processes with no thought disorder.  [Tr. 529].  Ms. Jones did not relate

15

her opinion in any way to any mental or physical impairment. Instead, in apparent reliance on plaintiff's self-reported "ranting and raving," Ms. Jones predicted a *possible* limitation due solely to "characterological issues." Mere misbehavior or deficiencies of character, without more, are not evidence of a physical or mental impairment. Therefore, Ms. Jones's opinion had no place in plaintiff's RFC, and the ALJ correctly excluded it.

### F. Mental RFC Assessment

A state agency source (signature illegible) completed a Mental RFC Assessment shortly after Ms. Jones's second consultative examination. In section I of the form, the source predicted that plaintiff would be moderately limited in twelve of twenty categories. [Tr. 396-97]. Although the ALJ purported to give the state agency opinions "great weight," his decision neither adopted nor explained the rejection of the Mental RFC Assessment. Plaintiff contends that this is reversible error. The court disagrees, and finds any error to be harmless in the present case.

An administrative decision should generally not be reversed and remanded where doing so would be merely "an idle and useless formality." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citation omitted). At the same time, a reviewing court cannot find an error to be harmless solely because the claimant "appears to have had little chance of success on the merits anyway." *Id.* at 546 (citation omitted). Instead, the court must be able to discern at least *some* indirect support for the challenged rejection of a pertinent opinion, such as:

1. The medical opinion was so patently deficient that no reasonable fact-finder could have credited it;

2. The ALJ elsewhere adopted the opinion;

3. An earlier decision by the ALJ adequately addressed the issue; or

4. The ALJ's reasoning could be inferred from his overall discussion of the condition.

*Id.* at 547; *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462-66 (6th Cir. 2005).

The court finds the present Mental RFC Assessment to be "so patently deficient that no reasonable fact-finder could have credited it." Section III of the preprinted assessment form instructs the writer to, "Explain your summary conclusions [from section I] in narrative form." [Tr. 398]. The state agency source provided no substantive explanation, narrative or otherwise.

Further, the RFC form is inconsistent with Ms. Jones's findings. For example, the nonexamining state agency source predicted that plaintiff would be moderately limited in relating to coworkers [Tr. 397], but Ms. Jones after each in-person examination opined that plaintiff would have "no difficulty relating to others." [Tr. 308, 394-95]. Similarly, the nonexamining source predicted that plaintiff would be moderately limited in attention, concentration, and adaptation [Tr. 396-97], but Ms. Jones twice opined that plaintiff would have no such restrictions. [Tr. 309, 395].

The nonexamining source's opinions appear to be based more on plaintiff's subjective complaints than on the objective evidence. For example, plaintiff has claimed to

17

the Commissioner, "I'm not very sociable at all, I'm irritable, angry, depressed and nervous[.] [T]here's no way I'm very sociable." [Tr. 126]. Ms. Jones, however, predicted no limitation in social interaction. Plaintiff has claimed that she "can't remember anything." For example, she has twice stated that she forgot a "child support court date [and] had to spend 3 days in jail." [Tr. 349, 383]. However, Ms. Jones wrote, "Of note, she did not appear to have memory difficulties during the interview." [Tr. 393]. The nonexamining source predicted that plaintiff would be moderately limited in the use of public transportation, consistent with plaintiff's claim that she will not use that mode of transit because she does not "like to ride with strange people" and because she is "afraid of little old men." [Tr. 151, 308]. However, neither Ms. Jones nor psychiatrist Yong has predicted any such limitation <u>secondary to a mental impairment</u> as opposed to mere behavioral choice.

As an examining source (and because her views are better explained), Ms. Jones's opinions are entitled to greater weight. *See* 20 C.F.R. § 416.927(d)(1), (3). The ALJ did not err in relying on Ms. Jones's consultative examination reports. [Tr. 13-14]. Any error resulting from his failure to expressly discuss the Mental RFC Assessment is deemed harmless because that opinion "was so patently deficient that no reasonable fact-finder could have credited it."

## G. <u>Far Acuity</u>

In his October 2006 Physical RFC Assessment, nonexamining Dr. Ryan opined that plaintiff is capable of performing the full range of medium exertion, except that she

would be "limited" in far visual acuity. [Tr. 317-23]. In support of the latter opinion, Dr. Ryan cited the "uncorrected" optical findings of Dr. Breeding. [Tr. 319, 323]. Dr. Breeding found plaintiff's underlined_uncorrected distant vision to be between 20/50 and 20/70, but he did not record what her underlined_corrected distant vision is. [Tr. 313].

Plaintiff, who was born in 1969, claims to have used the same pair of glasses since age 13. In September 2007, nurse practitioner Bone wrote that plaintiff "needs eye exam [and] possible glasses." [Tr. 416]. Plaintiff states that she "need[s] glasses all the time but don't have them," and she has repeatedly claimed an inability to afford medical care. [Tr. 27, 151, 165, 171].

Plaintiff can, however, afford to "drink[] soft drinks all day long." [Tr. 387]. The argument that she cannot also afford a rudimentary eye examination and basic pair of glasses thus rings hollow. "An impairment that can be remedied by treatment will not serve as a basis for a finding of disability." *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967). Any error relating to the ALJ's failure to discuss Dr. Ryan's distant vision restriction was therefore harmless because the opined limitation was, under *Henry*, "so patently deficient that no reasonable fact-finder could have credited it."

## H. Exposure to Heat and Cold

Nonexamining Dr. Reeta Misra completed a Physical RFC Assessment in February 2008. Dr. Misra opined that plaintiff can perform the full range of medium work with the exception that she should avoid concentrated exposure to heat and cold. [Tr. 448-

54]. Again, despite purporting to give "great weight" to the state agency sources, the ALJ did not address Dr. Misra's opinion or explain his rejection of it. Plaintiff again argues that this was reversible error, and the court again disagrees.

In the RFC form section concerning environmental limitations such as heat and cold, the physician is directed to "[d]escribe how these environmental factors impair activities and identify hazards to be avoided. Also, explain how and why the evidence supports your conclusions . . . . Cite specific facts upon which your conclusions are based." [Tr. 451]. In response, Dr. Misra directs the reader to section IV of the form. [Tr. 451]. In her section IV narrative, however, Dr. Misra does not explain her predicted temperature restrictions whatsoever. [Tr. 454]. Her narrative is instead noteworthy for the observation that plaintiff's complaints are overstated. [Tr. 454].

The administrative record contains no objectively-supported evidence that plaintiff cannot endure concentrated exposure to temperature extremes. While plaintiff has occasionally raised that subjective claim, Dr. Misra recognized that plaintiff's complaints are overstated. Dr. Misra's opined environmental restriction is wholly unexplained and thus "so patently deficient that no reasonable fact-finder could have credited it." Any error pertaining to the discussion of Dr. Misra's opinion was harmless.

## I. Prior Hospitalizations

Next, plaintiff cites two brief prior psychiatric hospitalizations from 1988 (suicide attempt) and 2000 (marital difficulties and polysubstance abuse). [Tr. 305, 458, 460]. She complains, "The ALJ did not even mention th[ese] hospitalization[s] in his decision, even when

20

concluding that Plaintiff has experienced no episodes of decompensation." [Doc. 9, p. 16].

Plaintiff's reference to "episodes of decompensation" concerns the ALJ's determination [Tr. 10-11] that she does not meet or equal the Commissioner's mental health listings found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04 (affective disorder) and 12.08 (personality disorder). Plaintiff however offers no argumentation as to why the ALJ should have considered episodes which predated her alleged disability onset date by five and seventeen years, nor does she offer any argumentation pertaining to the other requirements of listings 12.04 and 12.08. The issue is waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

### J. Bipolar Disorder and July 17, 2008 Appointment

Through sporadic counseling with Frontier Health, plaintiff carries a diagnosis from psychiatrist Yong of "rule out bipolar disorder." [Tr. 387]. Conversely, plaintiff claims that Dr. Yong actually diagnosed bipolar disorder ("I found out I'm bipolar. Dr. Yong said it sounded like it is but it's kind of iffy."). [Tr. 390].

At a July 2008 Frontier Health appointment, nurse Robin Denison referred to plaintiff's diagnosis as "bipolar disorder" rather than "rule out bipolar disorder." [Tr. 528]. At that same appointment, plaintiff appeared "somewhat depressed" with reduced memory and concentration *that day*. [Tr. 528]. Plaintiff argues, "The ALJ did not mention this visit in his decision, nor did he consider Plaintiff's diagnosis of bipolar disorder." [Doc. 9, p. 17]. Plaintiff does not, however, specify any objectively-supported restrictions pertaining to nurse Denison's one-time diagnosis - a diagnosis that is in unexplained conflict with that of plaintiff's psychiatrist. Similarly, plaintiff offers no argumentation regarding how her presentation at a single counseling appointment would be relevant to the requirement that a disabling impairment must be of twelve

months duration. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The issue is waived. *McPherson*, 125 F.3d at 995-96.

## K. Conclusion

For the reasons provided herein, the court finds substantial evidence to support the ALJ's RFC findings and his ultimate conclusion. The substantial evidence standard of review grants ALJs "a zone of choice" within which they can weigh conflicting evidence. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Perhaps a different factfinder could have reached a different conclusion in this case, but that is not the standard of review binding this court. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993). The final decision of the Commissioner will be affirmed, and an order consistent with this opinion will be entered.

ENTER:


_____ s/ Leon Jordan _____
United States District Judge